# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

LYDIA GOULART; KYLE TRAVERS,
        *Plaintiffs-Appellants,*

v.

PAUL D. MEADOWS, in his official
capacity as Division Chief of the
Calvert County Parks and
Recreation Department; BOARD OF
COUNTY COMMISSIONERS OF CALVERT
COUNTY,

        *Defendants-Appellees.*

No. 02-1962

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-00-286-PJM)

Argued: May 9, 2003

Decided: September 26, 2003

Before NIEMEYER and MOTZ, Circuit Judges, and
Joseph R. GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Goodwin wrote the opinion, in
which Judge Motz joined. Judge Niemeyer wrote an opinion concur-
ring in part, dissenting in part, and concurring in the judgment.

---

## COUNSEL

**ARGUED:** Michael Paul Farris, HOME SCHOOL LEGAL
DEFENSE ASSOCIATION, Purcellville, Virginia, for Appellants.

Daniel Karp, ALLEN, KARPINSKI, BRYANT & KARP, Baltimore, Maryland, for Appellees. **ON BRIEF:** James R. Mason, III, HOME SCHOOL LEGAL DEFENSE ASSOCIATION, Purcellville, Virginia; Jordan W. Lorance, ALLIANCE DEFENSE FUND LAW CENTER, Scottsdale, Arizona, for Appellants. Victoria Shearer, ALLEN, KARPINSKI, BRYANT & KARP, Baltimore, Maryland, for Appellees.

---

**OPINION**

GOODWIN, District Judge:

The Board of County Commissioners of Calvert County, Maryland (Calvert County or the Board) has a policy in place prohibiting the use of its community centers for private educational instruction intended to meet state educational requirements. Pursuant to that policy, the Board denied the applications of two homeschooling mothers, Lydia Goulart and Kyle Travers, to use space at the Calvert County Northeast Community Center in Chesapeake Beach, Maryland, for meetings of a geography club and a fiber arts club. Goulart and Travers brought suit against Calvert County, alleging that the denial of their applications violated their free speech rights under the First and Fourteenth Amendments and also violated their right to equal protection of the law under the Fourteenth Amendment. The district court granted summary judgment to Calvert County, holding that the plaintiffs' proposed use of the community centers was a not a form of expressive activity protected by the First Amendment. We disagree, and hold that the plaintiffs' proposed use is afforded First Amendment protection. We also conclude, however, that the Board's exclusion of the plaintiffs from the community centers, which we classify as limited public fora, is viewpoint-neutral and reasonable in light of the purpose of the centers. It is reasonable for the Board to limit use of the community centers to recreational and community enrichment activities, and formal private education is not a use that is consistent with those purposes. We conclude that Calvert County's exclusion of the plaintiffs' proposed uses does not violate the plaintiffs' right to free speech or to equal protection under the First or Fourteenth Amendments. We affirm the order of the district court

granting summary judgment to Calvert County, although under different reasoning.

## I.

Calvert County operates four community centers directly supervised by the Division of Parks and Recreation.[1] Upon application and approval, Calvert County residents may use the centers for various purposes set forth in a written Community Center Use Policy (Use Policy). The Use Policy generally states that Calvert County has "provided each district with community centers to afford its citizens a place to participate in activities which benefit the community as a whole." The Use Policy states that the purpose of the community centers is to provide a place for: (1) Park and Recreation programs; (2) meetings of community organizations; (3) large community events; (4) teen gatherings; and (5) fitness activities. The Use Policy states that the community centers are available for: (a) recreational uses (birthday parties, baby showers, receptions); (b) meetings of community organizations; and (c) non-profit fundraising events. The Use Policy prohibits: (a) business or for-profit activities; (b) any activity that is illegal, may incite riot or disturbance, or is in violation of the County's rules and regulations; and (c) possession and consumption of alcoholic beverages.[2]

---

[1]The four Calvert County community centers are: (1) Northeast Community Center in the town of Chesapeake Beach; (2) Mt. Hope Community Center in the town of Sunderland; (3) North Beach Community Center in the town of North Beach; and (4) Southern Community Center in the town of Lusby.

[2]After litigation was commenced in this case, Calvert County modified its written Use Policy to include the following "Prohibited Use":

    (d)    Instructional, educational and related enrichment activities of the type usually offered in the public schools to children of school age, including activities in English language arts (such as reading, writing, and spelling), mathematics, science, social studies, art, music, health and physical education are prohibited, it being intended that the community centers not be used for such activities associated with meeting the State requirements for elementary or secondary education. This prohibition does not apply to activities conducted by any agency of the Calvert County Government, the Calvert County Public Library or the Calvert County Board of Education.

The Use Policy requires written applications for use to be submitted through the Recreation Coordinator. The Recreation Coordinator has "the right to refuse or revoke any application not in accordance with the provisions [of the Use Policy]." Meeting space is allocated on an annual basis and groups are limited to one meeting per week for a maximum of two hours. The Use Policy has been modified over time to prohibit private parties, dances, and weddings in the gymnasiums, which are reserved for athletic purposes, and to establish "Policies to Facilitate Exclusion of Non-County Residents."

Calvert County offers a myriad of courses at the community centers on a wide variety of topics sponsored by the Parks and Recreation Department, including: (1) sewing, crochet, knitting, and basket-making; (2) porcelain doll making; (3) sign language for the deaf; (4) drawing, scratch board art, and oil painting; (5) math tutoring; (6) guitar; and (7) cooking. Calvert County also has permitted private individuals to teach courses and offer instruction in the community centers. These activities include: (1) classes teaching English to non-English speaking people; (2) courses in magnets and ceramic technology; (3) a workshop on music teaching techniques sponsored by the Music Teachers Association of Southern Maryland; (4) skin care and nail care classes; (5) baton twirling classes; (6) a church-sponsored marriage and parenting enrichment seminar; (7) violin lessons; (8) lessons on reading by the Literacy Council; (9) theater and drama instruction for youth ages 9-16; (10) CPR and first aid training; (11) Boy Scouts, Girl Scouts, Cub Scouts, and Brownies meetings; and (12) Boys and Girls Club activities.

Calvert County's policy prohibiting private educational activities intended to meet state educational requirements first began in late 1994 as a result of an application for use of the Mt. Hope Community Center by a for profit private school called Benjamin Franklin Academy (BFA). Specifically, BFA requested the use of a room with a chalk board, chairs and desks for at least twenty people, and separate gender bathroom facilities, for four hours per day, three days per week. The arrangement was to be temporary until the group could obtain its own facility for school instruction.

On September 9, 1994, Paul Meadows, the Division Chief of the Parks and Recreation Department, sent an memorandum to the Board

regarding BFA's application to use the Mt. Hope Community Center. In that correspondence, Meadows recommended that the proposed use be denied on the basis that the purpose of the center was "to provide recreational opportunities to the community not to function as a school." Meadows expressed concern that permitting the proposed use would lead to potential conflicts between "noisy recreation activities and the need for quiet in a school setting." He also cautioned that the arrangement could turn out to be a permanent one and that the school's enrollment might grow and "restrict[ ] community and recreational use." Finally, Meadows noted that allowing a private school to operate in the community center would "send[ ] the wrong message to the [County] Board of Education." At its September 1994 meeting, the Board formally denied the school's application for use of the center, reasoning that "[t]he function of the facility is to provide recreational activities to the community."

Following the Board's refusal to permit BFA to use the community centers for private educational instruction, individual homeschooling parents began to apply for use of the community centers for instructional classes for homeschooled children. After consulting with the County Administrator, Richard Holler, Meadows began interpreting the Board's decision regarding the BFA application as precedent for rejecting *any* application which sought to use the space for private educational activities for state educational credit. The first formal articulation of the ban on private educational activities was in an interoffice memorandum dated October 24, 1995, from Meadows to the Recreation Coordinators at each center. The memorandum, titled "Policy - Home Tutoring," stated that "home schooling groups are not permitted to use the community centers," and clarified that the exclusion applied to all "non-Board of Education affiliated/sponsored schools."

On two occasions after October 1995, homeschooling instructional classes used to fulfill state educational requirements accidentally were permitted in the community centers. Groups were approved to use the facilities at Northeast Community Center and Southern Community Center.[3] When Meadows became aware of these approvals, he

---

[3]With respect to the first accidental permitted use at the Northeast Community Center, two separate Recreational Coordinators approved the

advised the Recreation Coordinators that the uses were impermissible and directed them to terminate the use at the end of the approval cycle.

Homeschool groups and private schools are permitted to use Calvert County's community centers for any purpose unrelated to fulfilling state educational requirements. For example, Calvert County has permitted the following uses of the community centers: (1) a formal Christmas dinner for homeschoolers; (2) membership meetings once a month for parents of homeschoolers; (3) a Valentine's Day party for homeschooled students; (4) a planning meeting of the Christian Home Educators Network; and (5) fundraising events for private schools. The record shows that private, independent, and homeschooled children are permitted to participate in the activities offered at the Calvert County community centers. Moreover, private school, independent school, and homeschooled children have claimed school credit for their participation in these activities. That is to say, the Board does not permit homeschool instructors to use the community centers to offer homeschool educational classes intended to satisfy state educational requirements, but the Board does not try to prevent individual children from participating in community center activities and later claiming State educational credit for that activity. This reflects the Board's general approach to use applications, which focuses on the applicant and his or her purpose for using the facility, not on the intentions of the individual participants.

The plaintiffs in this case, Lydia Goulart and Kyle Travers, are two homeschooling mothers and Calvert County residents who independently filed applications to use space at the Northeast Community Center to conduct private educational activities to fulfill state educational requirements.[4] On June 14, 1999, Lydia Goulart, in the name

homeschooling instructional classes for the 1995-1996, 1996-1997, and 1997-1998 school years. Both Recreational Coordinators testified in their depositions that they were unaware at the time of Calvert County's policy against the use of community centers for private educational classes for state educational credit. The second accidental permitted use was by Janice Jones, a secretary, when Diane Holloway, Southern Community Center's Recreation Coordinator, was on vacation and did not have an assistant recreation coordinator.

[4]Under Maryland law, homeschoolers have three options to conduct homeschooling: (1) under the supervision of a county superintendent of

of "Chesapeake Home Educators," sought to use rooms in the Northeast Community Center for a geography club. The application requested rooms for every Tuesday of the school year from 2:30-4:30 p.m. and indicated that the use was for a "geography club for kids K-2, 3-8 and preschoolers (siblings of older kids) . . . [t]he kids will be learning geography, playing games about geography." The application indicated that approximately sixty participants were expected. The geography club held one session, but Mary Lou Johnson, the Recreation Coordinator at Northeast Community Center, subsequently revoked Goulart's application. Johnson asserted that Calvert County's policy prohibited homeschoolers from making "educational" use of the community centers.

On October 13, 1999, Kyle Travers submitted an application for use of the Northeast Community Center, requesting a room "any afternoon each week through Dec., . . . any time in the afternoon for 1-1 1/2 hours" for a "fiber arts club — knitting, crochet, spinning, weaving, etc." The application indicated that between fifteen and twenty participants were expected. Johnson denied Travers's application, again citing Calvert County's policy against private educational classes for state educational credit in the community centers.[5]

---

school; (2) under the supervision of a church-operated educational program ("church umbrella" school); or (3) under the supervision of a state-approved nonpublic school. All homeschoolers are required to file a homeschooling form with their County Board of Education. Designating a private umbrella school allows parents to bypass all direct state regulation with the exception of filing the form with the County.

Homeschooling parents must maintain a portfolio, including "relevant materials such as instructional materials, reading materials, and examples of the child's writings, work sheets, workbooks, creative materials, and tests." This portfolio is open to the inspection of the County Superintendent. The plaintiffs concede that they intended to use the space in the Northeast Community Center to engage in private educational activities that would fulfill state education requirements and were intended to be claimed as such on their children's portfolios.

[5]At approximately the same time, Travers submitted a separate application on behalf of "Chesapeake Home Educators" for use of the community center facility for "regular monthly meetings of membership." Calvert County's initial decision to deny this separate application was reversed and use of the center was approved based on the fact that the meetings would not involve private educational instruction.

Before commencing this lawsuit, counsel for the plaintiffs sent a letter to the Board asserting that the exclusion of the Goulart's and Travers's proposed uses was unconstitutional. In response, the Board explained that:

> The policy to which you object applies to all educational organizations, whether they are home schoolers, parochial schools or independent private schools. Community centers are designed and built for the recreational needs of the community at large. We do not want to devote space in the centers for educational activities associated with meeting the State requirements for elementary or secondary education. We are meeting those needs through our funding of the Calvert County Board of Education. We believe that allowing the centers to be used for formal education would amount to duplication of services.

On January 31, 2000, the plaintiffs filed suit in the federal district court for the District of Maryland, alleging that Meadows and the Board violated their right to free speech under the First Amendment and their right to equal protection under the Fourteenth Amendment. After a hearing on the parties' cross-motions for summary judgment, the district court granted summary judgment to the defendants on August 20, 2002. The district court found that the plaintiffs had not demonstrated how their proposed use of the community centers — teaching a geography or fiber arts class — was expressive conduct within the meaning of the First Amendment. Accordingly, the district court held that the exclusion did not implicate the plaintiffs' right to free expression under the First Amendment. The district court also rejected the plaintiff's equal protection claim. The district court found that homeschoolers are not a suspect class and that homeschooling parents do not have a "fundamental right" to insist that the government make certain benefits available to their children in connection with their education. Applying rational basis review, the district court held that the exclusion bore a rational relationship to Calvert County's legitimate governmental interest in maintaining the recreational character of the community centers.

We first discuss the plaintiffs' free expression claim under the First Amendment and then turn to their equal protection claim under the

Fourteenth Amendment. We review *de novo* the district court's grant of summary judgment to the defendants, viewing the evidence in the light most favorable to the nonmoving party. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## II.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.[6] The first inquiry a court must undertake when a First Amendment claim is asserted is whether the plaintiff has engaged in "protected speech." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). If so, the court "must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Id.* After identifying the type of forum, the court "must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Id.*

Before proceeding with our analysis, we pause to clarify some terminology necessary to discuss the parties' respective claims. In comparing the various types of educational courses permitted and excluded by the Board, there are at least two relevant distinctions that recur throughout the discussion. First, we are asked to distinguish between courses intended to meet state elementary and secondary educational requirements and courses offered for general community enrichment. We will refer to the former as "formal educational courses," the term "formal" indicating that these courses must meet certain standards established by the State and are intended to culminate in a formal degree — a high school diploma. We will refer to the latter as "informal educational courses," the term "informal" reflecting the fact that these courses are intended to enrich and edify the participants but are not tied to particular State-established educational

---

[6]"This prohibition is made applicable to the States and local levels of government by the Fourteenth Amendment." *Edwards v. City of Goldsboro*, 178 F.3d 231, 245 n.10 (4th Cir. 1999).

criteria or intended to culminate in a degree. Second, we are asked to distinguish between formal educational courses offered through the public schools and formal educational course offered independently of the public schools. We will refer to the former as "formal public education" and the latter as "formal private education."[7]

A.

In this case, the district court held that the proposed educational instruction did not constitute protected speech, and thus was afforded no First Amendment protection. The court concluded that because the plaintiffs "articulate no expressive objective in their proposed use of the County's community centers," the plaintiffs' proposed teaching activity was not expressive conduct protected by the First Amendment. On appeal, the plaintiffs contend that the district court erred by excluding their proposed use from First Amendment protection. The district court began its analysis with Justice O'Connor's concurring opinion in *Roberts v. United States Jaycees*, 468 U.S. 609 (1984). In *Roberts*, Justice O'Connor stated that "protected expression may also take the form of quiet persuasion, inculcation of traditional values, *instruction of the young*, and community service." 468 U.S. at 636 (O'Connor, J., concurring) (emphasis added). The district court pointed out that this passage appeared in a discussion of the difficulties of determining "when a particular association of persons is predominantly engaged in expression." *Id.* at 637. In answering this question, Justice O'Connor contrasted activities with a particular expressive aim, such as "[l]awyering to advance social goals," with activities lacking an expressive goal, such as "ordinary commercial law practice." *Id.* at 636 (citing *NAACP v. Button*, 371 U.S. 415, 429-430 (1963); *Hishon v. King & Spalding*, 467 U.S. 69 (1984)). The dis-

---

[7]Our use of the term "private" is not intended to imply that the proposed homeschooling classes were open only to homeschoolers. While the plaintiffs have stated that the proposed classes were intended to meet state educational requirements and that they expected that most of the participants in the class to be homeschool students using the classes for that purpose, they would not have excluded non-homeschooling children from attending. Thus, we use the term "private education" to mean education not affiliated with the public schools, not education that is closed to non-homeschoolers.

trict court reasoned that to determine whether a given instance of "instruction of the young" is protected by the First Amendment, one must pursue a similar analysis regarding the expressive aims of the instruction in question. The court concluded that the proposed instruction in this case had no unique expressive aim, and thus was not afforded First Amendment protection.

While the district court's analysis of Justice O'Connor's opinion in *Roberts* has some force, we ultimately disagree. The *Roberts* decision involved the degrees of First Amendment protection afforded to voluntary associations, not to "pure speech" activities. Specifically, in *Roberts* the Court rejected a claim by the United States Jaycees that the Minnesota Human Rights Act, which compelled local chapters of the Jaycees to accept women as members, violated the Jaycees' First Amendment associational rights. *Id.* at 612. Accordingly, the examples given in Justice O'Connor's concurring opinion pertain to the question of whether an "association's *activity* is predominantly protected expression." *Id.* at 636 (emphasis added). Determining whether the *conduct* of a particular association amounts to protected *expression* is a different and more difficult question than determining whether a speech act is a form of protected expression. "Expressive conduct enjoys less protection than does pure speech and restrictions on its exercise are more likely to be constitutionally permissible." *Steakhouse, Inc. v. City of Raleigh*, 166 F.3d 634, 637 (4th Cir. 1999). While the Supreme Court has held that "it is the obligation of the person desiring to engage in assertedly expressive *conduct* to demonstrate that the First Amendment even applies," *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) (emphasis added), the same is not true of a person desiring to engage in what can be more appropriately classified as "pure speech." The plaintiffs rightly point out that their proposed uses — teaching a geography class and a fiber arts class — "involve the transmission of knowledge or ideas by way of the spoken or written word — speech." Because speech is the "activity" in question here, we reject the notion that the plaintiffs must affirmatively prove the uniquely expressive nature of that speech.

The Supreme Court, quoting the Journals of the Continental Congress, has stated that the notion of free speech includes "'the advancement of truth, science, morality, and arts in general . . . .'" *Roth v.*

*United States*, 354 U.S. 476, 484 (1957) (quoting 1 *Journals of the Continental Congress* 108 (1774)). Other courts have similarly indicated that "[e]ven dry information, devoid of advocacy, political relevance, or artistic expression, has been accorded First Amendment protection." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446 (2d Cir. 2001). We conclude that the plaintiffs' proposed use of the community centers for instructing children on the topics of geography and fiber arts is a form of speech protected under the First Amendment. *See Wilson v. Chancellor*, 418 F. Supp. 1358, 1362 (D. Or. 1976) ("A teacher's teaching is expression to which the First Amendment applies."). Accordingly, Calvert County's refusal to permit the plaintiffs' activities in its community centers is subject to First Amendment scrutiny.

## B.

The Supreme Court has adopted forum analysis as the means of analyzing restrictions placed on private speech that occurs on government property. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998); *Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 622 (4th Cir. 2002), *reh'g en banc denied*, 305 F.3d 241 (4th Cir. 2002). The three recognized types of fora are the traditional public forum, the nonpublic forum, and the designated or limited public forum. *Forbes*, 523 U.S. at 677; *Warren v. Fairfax County*, 196 F.3d 186, 193 (4th Cir. 1999) (en banc).

The first category of government property, the traditional public forum, is a place that "by long tradition or by government fiat ha[s] been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).[8] The government may not prohibit all expressive activity in a traditional public forum, and content-based restrictions on speech are valid only if they are narrowly tailored to serve a compelling state interest. *See Perry*, 460 U.S. at 45. "The state may also enforce regulations of the time, place,

---

[8]These "quintessential public forums" include public parks and streets. *Perry*, 460 U.S. at 45. The Supreme Court has also identified the "meeting hall" as a traditional public forum. *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974).

and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*

The second category of government property, the nonpublic forum, is not open by tradition or designation to the public for expressive activity. *Id.* at 46; *Cornelius*, 473 U.S. at 803. The government "can restrict access to a nonpublic forum 'as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Forbes*, 523 U.S. at 677-78 (quoting *Cornelius*, 473 U.S. at 800). "Control over access to a nonpublic forum can be based on subject matter and speaker identity as long so the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806; *see also United States v. Kokinda*, 497 U.S. 720, 730 (1990) (O'Connor, J., plurality op.). The Supreme Court has placed many types of government "property" in this category, including open areas of a military base,[9] household mail boxes,[10] a public school's internal mail system,[11] the federal government's annual charity drive,[12] a public high school newspaper,[13] sidewalk areas around a post office,[14] airport terminals,[15] and a televised debate between candidates for public office.[16]

The third category of government property, the designated public forum, is property which the government has opened for expressive activity to the public, or some segment of the public. *Warren*, 196 F.3d at 193 (citing *Forbes*, 523 U.S. at 677). A designated public forum can only be created by "purposeful government action" in which "the government must intend to make the property 'generally

---

[9]*Greer v. Spock*, 424 U.S. 828 (1976).

[10]*United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114 (1981).

[11]*Perry*, 460 U.S. 37.

[12]*Cornelius*, 473 U.S. 788.

[13]*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988).

[14]*Kokinda*, 497 U.S. 720.

[15]*Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672 (1992).

[16]*Forbes*, 523 U.S. 666.

available.'" *Forbes*, 523 U.S. at 678 (quoting *Widmar v. Vincent*, 454 U.S. 263, 264 (1981)). If the government "excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny." *Forbes*, 523 U.S. at 677. The Supreme Court has determined that a number of government properties fall within this category, including university meeting facilities generally open for use by student groups,[17] a school board meeting open to the public,[18] and a municipal auditorium and city-leased theater designed for and dedicated to expressive activities.[19] There is some confusion over the terminology used to describe this third category, as the Supreme Court and lower courts have also used the term "limited public forum." *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Cornelius*, 473 U.S. 799-802; *Perry*, 460 U.S. at 47-48. When the government has established a limited public forum, the government "is not required to and does not allow persons to engage in every type of speech." *Good News Club*, 533 U.S. at 106. The government "may be justified 'in reserving [its forum] for certain groups or for the discussion of certain topics.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 829) (alteration in original). To date, the Supreme Court has recognized two types of government property that clearly are limited public fora: public school facilities during after school hours[20] and a student activities fund of a public university.[21]

This court addressed the relationship between designated and limited public fora in *Warren v. Fairfax County*, 196 F.3d 186 (4th Cir. 1999) (en banc). In *Warren*, we treated the terms "designated public forum" and "limited public forum" as two names for the same forum. *Id.* at 193 ("The final category [is the s]o-called 'designated public fora' (often called 'limited public fora')"). Using the terms "desig-

---

[17]*Widmar*, 454 U.S. 263.

[18]*Madison Joint Sch. Dist. v. Wisc. Employment Relations Comm'n*, 429 U.S. 167 (1976).

[19]*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975).

[20]*Good News Club*, 533 U.S. at 106; *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392-93 (1993).

[21]*Rosenberger*, 515 U.S. at 829-30.

nated" and "limited" interchangeably, we explained that "[a] designated public forum can be opened only to a limited class of speakers or for limited topics." *Id.*

When a particular forum is classified as a designated/limited public forum, "[t]wo levels of First Amendment analysis" apply: the "internal standard" and the "external standard." *Id.* at 193-94. The "internal standard" applies to situations where "'the government excludes a speaker who falls within the class to which a designated [limited] public forum is made generally available.'" *Id.* at 193 (quoting *Forbes*, 523 U.S. at 677) (alteration in *Warren*). In this situation, the government's "'action is subject to strict scrutiny.'" *Id.* at 193 (quoting *Forbes*, 523 U.S. at 677). In other words, "as regards the class for which the forum has been designated, a limited public forum is treated as a traditional public forum." *Id.* On the other hand, the "external standard" "places restrictions on the government's ability to designate the class for whose especial benefit the forum has been opened." *Id.* at 194. We explained that "once a limited forum has been created, entities of a 'similar character' to those allowed access may not be excluded." *Id.* at 194 (citing, *inter alia*, *Perry*, 460 U.S. at 48). The government's designation of the class for the "external standard" is "subject only to the standards applicable to restrictions on speakers in a nonpublic forum," namely that "the selection of a class by the government must only be viewpoint neutral and reasonable in light of the objective purposes served by the forum." *Id.*

In this case, the defendants first contend that the community centers are nonpublic fora. The government may "retain nonpublic forum status by allowing selective, permission-only access to the forum." *Warren*, 196 F.3d at 193. To remain a nonpublic forum, "[t]he granting of such permission must be contingent upon non-ministerial judgments." *Id.* (citations omitted). Because Calvert County requires an application for use of the community centers, the defendants assert that the community centers have retained their nonpublic fora status.

We are not persuaded that the community centers at issue in this case are nonpublic fora. First, the Recreation Coordinators at the community centers make only ministerial judgments because they are allowed to deny an application only if it is "not in accordance with the provisions outlined in the [Use Policy]." In other words, if a pro-

posed user falls within the confines of the Use Policy, the application will be granted. Here, permission to use the community centers is not "selective," but is "granted as a matter of course" to all individuals or groups who fall within the Use Policy. *Perry*, 460 U.S. at 47. In addition, Calvert County has intentionally made the community centers generally available to certain types of expressive activity. *See Forbes*, 523 U.S. at 677. For example, the community centers are open to a wide variety of instructional activities, such as courses in sewing, basket-making, sign language for the deaf, math tutoring, English for non-English speakers, and marriage and parenting enrichment. We classify the community centers as designated or limited public fora and will analyze the restrictions here accordingly.[22]

## C.

Having identified the Calvert County community centers as limited public fora, we must determine whether to apply the internal or external standard to the exclusion of the plaintiffs. The plaintiffs argue that because the community center permits public classes on such a wide variety of topics, homeschoolers using the facilities for homeschooling classes fall "within the class to which [the] designated [limited] public forum is made generally available.'" *Warren*, 196 F.3d at 193 (quoting *Forbes*, 523 U.S. at 677 (alterations in *Warren*)). Accordingly, they argue that we should examine the exclusion under the internal standard — strict scrutiny. *Id.* The Board, in contrast, argues that the plaintiffs' proposed use — private education intended to meet state education requirements — does not fall within the class of uses for which the community centers have been designated. Accordingly,

---

[22]As noted above, in *Warren* we treated designated and limited public fora as two names for the same type of forum. If there is a distinction between the two, however, we would classify the community centers as limited public fora. The community centers are "reserv[ed] for certain groups . . . [and] certain topics." *Good News Club*, 523 U.S. at 106. For ease of reference, we will refer to the Calvert County community centers as "limited public fora" rather than the more cumbersome "designated/limited public fora," acknowledging that under the precedent set in *Warren* there is no practical difference between a designated and a limited public forum, and that if we were forced to choose between the two we would classify the community centers as limited public fora.

the Board argues that its decision to exclude the plaintiffs' proposed use is governed by *Warren*'s external standard — viewpoint-neutrality and reasonableness in light of the purpose of the forum.

In *Warren* we explained that "once a limited forum has been created, entities of a 'similar character' to those allowed access may not be excluded." *Id.* at 194 (quoting *Perry*, 460 U.S. at 48 (holding that in a limited public forum, "the constitutional right of access . . . extend[s] only to other entities of similar character.")). Accordingly, to determine which standard to apply to the Board's exclusion of the plaintiffs in this case, we must determine whether homeschoolers as a group are an entity of a "similar character" to those groups permitted to use the community centers. Of course, homeschooling parents and children are not generally barred from using the community centers, and in fact have been permitted to use the centers for, among other things, a formal Christmas dinner and monthly membership meetings. Rather, the Board has denied access to homeschoolers only when they sought to use the community centers for a particular purpose — formal private education intended to satisfy state educational requirements. It is more accurate, then, to ask whether formal private education is an activity of a "similar character" to those activities permitted by the Board.

Determining whether two different activities are of a "similar character" is, admittedly, a somewhat amorphous inquiry — two different activities are always different in certain ways and similar in other ways. Here, the uses proposed by the plaintiffs are similar in many respects to some of the uses permitted by the Board — both are educational classes covering similar topics and offered (at least in part) to children. On the other hand, the uses are different in at least one important respect — the permitted classes are intended for general public enrichment, whereas the plaintiffs' proposed classes are intended to fulfill state educational requirements. The "similar character" standard asks us to determine which of these various indicia of similarity is the relevant one. If the content of the classes is the relevant factor, then the plaintiffs' proposed use is of a "similar character" to those classes that are permitted. On the other hand, if formal versus informal education is the relevant factor, then the plaintiffs' proposed use is not of a "similar character" to the permitted uses.

We conclude that the purpose of the limited forum in question should serve as a touchstone for determining the relevant indicia of similarity between two proposed uses. *See Calash v. City of Bridgeport*, 788 F.2d 80, 84 (2d Cir. 1986) (in light of stadium's purpose as a venue for "civic, charitable, and non-profit speakers," for-profit music concerts are not of a similar character as non-profit music concerts). If the difference between two proposed uses is unrelated to the purpose of the forum, then that difference should not serve as a basis for distinguishing between two otherwise-similar entities. Consider if the director had approved an application by one Boy Scout troop and denied the application of another on the ground that the leader of the first troop was the director's brother. The difference between the two troops — the troop leader's familial relationship to the director — is completely unrelated to the purpose of the community centers, and thus would not be a relevant factor for determining whether or not the two groups were of a "similar character." But if the difference between two proposed uses bears some relationship to the purpose of the facility, then it would make sense for the government to use that difference as a basis for drawing boundaries. We proceed to consider, in light of the limited purpose of the community centers, whether the plaintiffs' proposed use is of a "similar character" to the permitted uses.[23]

---

[23]We acknowledge that by looking to the purpose of the forum to determine whether two proposed uses are of a similar character, we are blurring the lines between the "similar character" inquiry and the "external standard" for evaluating speech restrictions in a limited public forum — both inquiries involve, roughly speaking, a determination of whether the distinction drawn is relevant to the purpose of the forum. The overlap in these inquiries, however, is not a sufficient reason for us to reject this approach. We have observed a similar overlap in other seemingly distinct doctrinal inquiries in the context of First Amendment forum analysis. For example, in *Warren* we acknowledged that the similarity between the external standard for speech restrictions in a limited public forum and the standard for speech restrictions in a nonpublic forum "in effect makes the limited public forum analytically indistinct from a nonpublic forum. If it is reasonable (or unreasonable) to exclude a speaker from a nonpublic forum, then it must also be reasonable (or unreasonable) to exclude the speaker from the class of speakers to which the forum has been opened on a limited basis." *Warren*, 196 F.3d at 194 n.8. As in *Warren*, we find some overlap in analysis unavoidable in this circumstance.

The defendants argue that the restrictions in the Use Policy and in their *de facto* policy against private instruction of children intended to meet state educational requirements are reasonable because the purpose of the community centers is to provide meeting space and recreational and informal enrichment opportunities for the community. In addition to the stated purposes of the community centers, Calvert County acknowledges that the community centers are also used for informal community education and enrichment courses, such as courses in English as a second language, sewing, basket-making, drawing, oil painting, and math tutoring. Calvert County made clear at oral argument that it plans to continue permitting informal community educational activity, so long as it is not intended to meet state educational requirements. Whether stated or not, then, one purpose of the community centers is to provide a venue for informal community education and enrichment courses.

The plaintiffs argue that the policy is not reasonable because the nature of the activities in question are identical in all respects relevant to the demands placed on the community centers. To an observer, classes intended for general community enrichment and classes intended to satisfy state education requirements might well appear completely indistinguishable. Because the prohibited activity is essentially indistinguishable from the permitted activity, the plaintiffs argue, it cannot be reasonable to permit one and prohibit the other. There are two responses to this argument.

First of all, the similarity of the content of two proposed speech activities does not always mean that both must be treated the same. The Supreme Court has repeatedly held that distinctions based on the *status* of the speaker can be a permissible way to limit the scope of the forum. For example, in *Forbes*, a state-owned public television broadcaster excluded Forbes, a candidate for political office, from participating in a broadcast of a debate among other candidates for the same office. 523 U.S. at 669. Despite the fact that the speaker sought to engage in precisely the same type of speaking activity — espousing his political views — as those permitted to speak, the Court held that it was permissible for the broadcaster to exclude the speaker based on his status as a candidate with little public support. *Id.* at 683. Likewise, in *Perry*, the Court held that it was permissible for a school district to deny access to the school's internal mail system to a union that

did not serve as the bargaining representative of the school employees, even though the school permitted the union that did represent the employees to use the mail system. 460 U.S. at 48-53. The rival union in *Perry* sought to engage in the exact same type of activity as the employees' exclusive bargaining representative — using the school system's internal mail facilities to communicate with school employees. *Id.* at 39. Despite the similarity in the proposed uses, the school board was permitted to distinguish between the two unions based on their status — whether or not they currently served as the exclusive bargaining representative of the teachers. *Id.* at 49. It is true that in both *Forbes* and *Perry* the fora in question were nonpublic fora. *Forbes*, 523 U.S. at 679-80; *Perry*, 460 U.S. at 46. But in a limited public forum, just as in a nonpublic forum, the government "may be justified in 'reserving [its forum] for certain groups or for the discussion of certain topics.'" *Good News Club*, 533 U.S. at 106 (quoting *Rosenberger*, 515 U.S. at 829). And as with a nonpublic forum, "the state's power to restrict speech . . . [in a limited public forum] must not discriminate against speech on the basis of viewpoint, and the restriction must be reasonable in light of the purpose served by the forum." *Id.* at 106-07 (quotations and citations omitted). Accordingly, in determining how the government may limit the purpose of a forum that it has created, we find *Forbes* and *Perry* instructive. These cases illustrate that the government may draw permissible status-based distinctions among different classes of speakers in order to preserve the purpose of the forum, even when the proposed uses by those inside the permitted class of speakers and those outside the permitted class of speakers are quite similar.

The second response to the plaintiffs' argument about the similarity of the proposed instructional activities is that despite the similarities, the permitted and prohibited activities *are* different in one important respect: the permitted activities are informal educational classes intended for community enrichment, whereas the prohibited activities are formal private educational classes intended to fulfill state educational requirements. Compare this distinction with the County's prohibition on for-profit business activities. The plaintiffs concede that the Board's exclusion of for-profit activities is consistent with the First Amendment. *See, e.g.*, *Calash v. City of Bridgeport*, 788 F.2d 80, 84 (2d Cir. 1986). The "for-profit" exclusion, like the "private formal education" exclusion, shows how expressive activity of the very

same nature can be rendered permissible or impermissible, in light of the purpose of the forum, depending on the purpose behind that activity.

The Second Circuit's decision in *Calash* illustrates this principle in the for-profit/not-for-profit context. In *Calash*, the court held that the government could permissibly exclude a for-profit music concert from a public stadium where not-for-profit concerts were held. *Id.* at 84. The concert promoter had applied to the City of Bridgeport's Parks and Recreation Board for permission to hold a for-profit Beach Boys concert at the stadium. *Id.* at 81. The Board denied the application, citing its policy of "restricting use of the facility to civic, charitable and non-profit entities." *Id.* The promoter then re-applied to hold the same concert, this time claiming that all proceeds would benefit a local zoo. *Id.* The Board, unwilling to take the promoter at his word, denied the application without prejudice but invited the promoter to renew the application "if he provided the Board with information about his finances and prior experience and the arrangement with the zoo." *Id.* The promoter instead elected to bring suit. The Second Circuit classified the auditorium as a nonpublic forum and upheld the exclusion. *Id.* at 84. The court also observed, however, that even if the auditorium were a limited public forum, the exclusion would nonetheless have been justified based on the purpose of the forum, which was limited to "civil, charitable, and non-profit" concerts. *Id.* Thus, the relevant difference between permitted concerts and this prohibited concert was the purpose of the concert promoter — that is, whether the concert had a for-profit purpose or a "civil, charitable, [or] non-profit" purpose. *Id.* If the promoter had been willing to prove his non-profit purpose, it appears that he would have been permitted to use the facility. *Calash* demonstrates how a speaker's purpose can, in certain circumstances, serve as a relevant basis for the government to restrict access to a limited public forum, even when the proposed uses are otherwise identical. Here, as in *Calash*, the Board has decided that the community centers are not to be used to subsidize for-profit business, and the plaintiffs agree that this judgment is reasonable and permissible.

It seems equally reasonable for the County to restrict its support for formal education to the public schools. In its support of the public schools, the County has provided a venue for children to receive edu-

cational instruction intended to meet state educational requirements. The County does not force children to participate in the public schools, and some children opt out of the system, choosing instead to attend private schools or participate in homeschooling in order to meet their state educational requirements. Having provided a venue for children to meet their state educational requirements, however, the County has decided not to allocate community center resources in pursuit of this same goal. That is to say, the County has decided that its community centers should not be used for private education intended to meet state educational requirements. This policy does not strike us as hostile to private education or homeschooling any more than the County's policy against for-profit activity in the community centers strikes us as hostile to private business.

Accordingly, we conclude that there is a relevant distinction, in light of the forum's purpose, between those courses that the Board has permitted and the plaintiffs' formal private education courses. Given this relevant distinction between the plaintiffs' proposed use and the uses permitted by the Board, the two uses are not of a "similar character," and the Board's exclusion of the plaintiffs does not trigger strict scrutiny review. Instead, we will inquire whether the Board's exclusion of the plaintiffs is reasonable in light of the purpose of the forum and whether it is viewpoint-neutral.

D.

1.

We first examine whether the Board's restriction on expression in the community centers, which we have classified as limited public fora, are "reasonable in light of the purpose served by the for[a]." *Cornelius*, 473 U.S. at 806; *see also Rosenberger*, 515 U.S. at 829. The government's decision to restrict access to a limited public forum "need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808 (emphasis in original). Reasonableness in this context is assessed "in light of the purpose of the forum and all the surrounding circumstances." *Id.* at 809. In other words, "[c]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in the light of the

characteristic nature and function of the particular forum involved." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650-51 (1981).

As noted above, our conclusion that there is a relevant distinction between the plaintiffs' proposed courses and the courses permitted by the Board already involved an examination of the reasonableness of the plaintiffs' exclusion in light of the purpose of the forum. Our prior discussion, which we will not restate here, suggests that the Board's distinction is reasonable. The plaintiffs, however, present an additional argument that we have not previously addressed as to why the Board's exclusion of their proposed classes is unreasonable in light of the purpose of the forum. We now turn to that argument.

The plaintiffs argue that Calvert County's exclusion is unreasonable because homeschool students can claim - indeed, have claimed - credit after the fact for classes taken at the community centers. Calvert County concedes that it does not try to prevent homeschool students from attending community enrichment courses and then, after the fact, filing the necessary papers to claim credit toward meeting their state educational requirements. Because of this, the plaintiffs argue, classes taught with the intent to meet state educational requirements must also fall within the purpose of this forum. The plaintiffs' argument has some force, for it highlights the very fine line that Calvert County draws with its current policy: under the policy, the community center may be used by children attending community enrichment classes, even when those students later claim state educational credit, but the center may not be used to hold classes intended to satisfy state educational requirements. While this line is admittedly a fine one, we conclude that Calvert County's policy nonetheless reasonably preserves the intended purpose of the community centers.

Calvert County's implementation of its policy is a reasonable, cost-effective approach to enforcing the distinction between informal community enrichment and formal private education. Calvert County has created a relatively simple application process that facilitates the quick and inexpensive allocation of community center resources, while allowing the County to preserve the limited purposes for which the community center was intended. If we were to require Calvert County to ensure that no participant in any community center activity

ever received state educational credit, we would be imposing an oner-
ous administrative burden that could result in Calvert County closing
its community centers to all educational activities. This would lead to
the unfortunate result of "less speech, not more." *Forbes*, 523 U.S. at
680. The Supreme Court has explained that permitting selective
access to government fora for speech "encourage[s] the government
to open its property to some expressive activity in cases where, if
faced with an all-or-nothing choice, it might not open the property at
all." *Id.* For this same reason, we refuse to require Calvert County to
achieve administrative perfection in order to draw a boundary that we
otherwise deem permissible. Calvert County's failure to pursue
expensive and unfeasible methods to prevent after-the-fact claiming
of school credit does not belie its stated purpose of preserving the
community enrichment purpose of the community centers.

The same boundary-drawing problem could just as easily appear in
other uses of the community center. For example, the record shows
that the community centers have been used for recreational card-
playing. Consider an application from a group of card-players indicat-
ing that the participants seek to use the community center for their
weekly high-stakes poker match. The record reflects that gambling is
an activity prohibited at the community center. Even if the County
strictly enforced its policy against gambling, it would not be difficult
for a group of card players to engage in a "recreational" game of cards
at the community center and then retire to a local bar to divvy up their
gains and losses based on their respective scores. While it would be
impossible for the County to prevent card players from converting
their recreational card game, after the fact, into a game where money
was at stake, surely the County could nonetheless prohibit card games
where gambling was the stated goal from the outset. Nor would we
have any reason to doubt the County's genuine commitment to limit-
ing the community centers to non-gambling card playing simply
because certain card players were able to exchange their winnings and
losses after the fact.[24]

---

[24]We acknowledge that it is unlikely, to say the least, that recreational
card-playing is a form of expressive conduct protected by the First
Amendment. The purpose of this example is simply to illustrate that the
boundary-drawing problem identified by the plaintiffs is not limited to
the context of formal versus informal education, and that the problem
should not suggest that the boundary drawn is impermissible or illusory.

We conclude that Calvert County's denial of the plaintiffs' applications to use the community centers for private educational classes intended to meet state educational requirements is reasonable in light of the nature and purpose of the community centers as places for recreation, community meetings, and informal community enrichment and education.

2.

We now turn to consider whether the Board's exclusion of the plaintiffs is also viewpoint-neutral. *See Forbes*, 523 U.S. at 676 (government cannot restrict access to a forum based on its agreement or disagreement with the speaker's views). The plaintiffs first argue that the exclusion is viewpoint-based because it discriminates against the "homeschooling" viewpoint. There is nothing in the record, however, to suggest that the plaintiffs' proposed instruction contained a particular or unique viewpoint in the areas of geography or fiber arts, or in any other area that they might wish to offer classes. The plaintiffs would presumably have shaped their courses according to their particular pedagological goals, but they have not identified some viewpoint on these (or other topics) that is unique them, to homeschoolers as a group, or to private educators as a group.

In addition, even if the plaintiffs have a unique viewpoint on these or other topics, the record shows that the Board's exclusion was not based on that viewpoint. The plaintiffs would have been free to use the community centers to teach the proposed classes from whatever particular viewpoint they may have had, so long as the classes were not intended to meet state educational requirements. There is no suggestion in the record that Calvert County intended to discriminate against the "homeschooling perspective" or that its policy demonstrates some widespread dislike or animus against homeschoolers. Homeschoolers and homeschool groups have always been permitted to use the community centers for any purpose other than as classrooms for formal private education.[25] In addition, the Board's policy

---

[25]As noted above, Calvert County approved the following applications by homeschool groups to use the community centers in the following ways: (1) the Chesapeake Home Educators, a homeschool group led by

against formal private education has been applied to BFA, a private academy, as well as to homeschoolers.[26] Because Calvert County's policy against permitting its community centers to be used by private, independent, or homeschool groups as classrooms or schools for the purpose of meeting state educational requirements is applicable without reference to viewpoint, the policy is viewpoint neutral.

3.

The plaintiffs also object to the fact that the Board's exclusion of them in this case is based on their purpose or intent in using the community centers. Such an intent-based distinction, the plaintiffs argue, is either equivalent to, or equally objectionable as, viewpoint-based discrimination. We disagree.

First of all, the plaintiffs err insofar as they equate a speaker's pur-

---

Travers, was permitted to use the Northeast Community Center once a month for three hours for the group's membership meeting; (2) Christian Home Educators Network was permitted to use the Southern Community Center for a meeting held from 6:30 p.m. to 9:30 p.m. on Tuesday evenings; (3) Travers was permitted to use the North Beach Community Center for a formal Christmas dinner for homeschoolers; (4) Share Homeschool Group was permitted to hold a Valentine's Day party for homeschooled students at Southern Community Center; and (5) a private school called the Tidewater School was permitted to use the Southern Community Center for a "Jumprope for Heart" fundraiser for the American Heart Association.

[26]The plaintiffs contend that BFA's application for use is distinguishable from the proposed use in this case because the Board could have denied BFA's application based on BFA's status as a for-profit organization as well as based on time, place, and manner restrictions. While this may be true, it does not change the fact that the Board did not cite either of these reasons in its denial of BFA's application; rather, the Board denied BFA's application because BFA's proposed use did not comport with the purpose of the community centers. Accordingly, the manner in which the Board denied BFA's application illustrates that the Board's policy against private formal education did not arise in the context of homeschooling and applies equally to homeschoolers and private academies.

pose with that speaker's viewpoint. Purpose and viewpoint are simply two different concepts. Two speakers could share the exact same viewpoint but have a different purpose for their respective speech activities. In this case, for example, the content and viewpoint of a permitted geography course could be the same as that of an excluded geography course, even though the purpose of the two courses was different — the purpose of the permitted course would be general community enrichment, whereas the purpose of the excluded course would be private education intended to meet state educational requirements. Likewise, two speakers could share the same purpose but have different viewpoints. Thus, determining access to a forum on the basis of a speaker's purpose is not the same as determining access based on the speaker's viewpoint.

Perhaps the plaintiffs are not arguing that purpose and viewpoint are the same, but rather that distinctions based on purpose are equally offensive as those based on viewpoint. The plaintiffs have cited no caselaw in support of this supposed limitation on how the government may or may not restrict access to a limited public forum, and we are not persuaded that purpose-based distinctions are an impermissible basis for government restrictions. For example, our discussion of *Calash* in part II.C demonstrates how a speaker's purpose in using a forum can, in certain circumstances, serve as a legitimate basis for the government to restrict access to a limited public forum. In *Calash*, the concert promoter's purpose for holding an otherwise-identical concert — profit versus charitable goals — changed the nature of that concert and determined whether the concert was compatible with the purpose of the forum. 788 F.2d at 81, 84. Because the stadium in *Calash* was limited to non-profit, charitable, or civic purposes, a for-profit rock concert was not consistent with those purposes. *Id.* at 84. Here, because the community centers are limited to the purposes of community recreation and informal enrichment, private instruction intended to meet state educational requirements is not consistent with those purposes. In both cases, the speaker's purpose alters the nature of the activity in a way that is relevant to the limited purpose of the forum.

The language used by the Supreme Court in discussing permissible speaker-based distinctions in limited public fora also reflects a clear difference between the concepts of purpose and viewpoint and suggests that it is permissible to draw distinctions based on the former.

The Court has explained that while "restriction must not discriminate against speech [or speaker] on the basis of viewpoint," the restriction is permissible so long as it is "'reasonable in light of the *purpose* served by the forum.'" *Good News Club*, 533 U.S. at 106-07 (quoting *Cornelius*, 473 U.S. at 806) (emphasis added). As this test makes clear, the government may limit a designated or limited public forum to certain purposes, and exclude topics of speech or classes of speakers that are inconsistent with that purpose. If the government is permitted to restrict access to a forum in order to preserve the purpose of that forum, it makes sense that the government can, depending on the circumstances, prohibit use of the forum on the basis of the speaker's purpose. Accordingly, we reject the plaintiffs' argument that the Board's denial of their permit application based on their purpose or intent in using the forum amounts to viewpoint discrimination or otherwise violates First Amendment principles.

E.

The plaintiffs present one final argument as to why their exclusion in this particular case violates the First Amendment. The plaintiffs argue that even if the state may generally draw status distinctions among speakers because their intended use is inconsistent with the purpose of the forum, such status distinctions may not be based on a speaker's exercise of a fundamental constitutional right. Applying that rule to the case at hand, the plaintiffs argue that their exclusion from the community centers is unconstitutional because it is based on their attempts to educate their children as they see fit — a recognized fundamental constitutional right. *See Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925).

The plaintiffs find support for this novel proposition of constitutional law in the Supreme Court's *Good News Club* decision. In *Good News Club*, the Milford Central School denied the Good News Club, a private Christian organization for children ages 6 to 12, permission to use the school cafeteria for weekly after-school meetings, on the ground that the Club's proposed use amounted to religious worship. 533 U.S. at 102-04. The Court assumed, for the sake of decision, that the school during these hours was a limited public forum, *id.* at 106, and held that "Milford's restriction violates the Club's free speech rights." *Id.* at 102.

The plaintiffs argue that *Good News Club* stands for the proposition that in a limited public forum, the government cannot draw otherwise-permissible status distinctions when the status in question involves the speaker's exercise of a fundamental right. In *Good News Club*, the plaintiffs contend, the school was simply making a status distinction between groups seeking to use the facilities for secular purposes and groups seeking to use the facilities for religious purposes. While this type of status distinction might otherwise be a valid manner of restricting access to a limited public forum, the plaintiffs argue, *Good News Club* illustrates that such distinctions cannot be based on the speaker's exercise of a fundamental right — in *Good News Club*, the fundamental right to the free exercise of *religion*; here, the plaintiffs' fundamental right to educate their children as they see fit. For the purposes of this argument, the plaintiffs do not contend that Calvert County's policy infringes on this fundamental right *per se* — they acknowledge that they are free to educate their children privately without using the community center. Rather, the plaintiffs argue that *Good News Club* represents an independent constitutional rule that depends on the intersection of First Amendment doctrine and fundamental rights doctrine.

The plaintiffs have articulated an interesting and novel proposition of constitutional law to explain the result reached by the Court in *Good News Club*. Notably, however, it is not the rationale given by the *Good News Club* Court majority itself to explain its decision. Rather than speaking in terms of the plaintiffs' fundamental right to the free exercise of religion, the court in *Good News Club* focused on "whether the exclusion constituted viewpoint discrimination." *Id.* at 107. The Court stated that "the Club teaches morals and character development to children," a permissible activity under the policy. *Id.* at 108. The school excluded the Good News Club, explained the Court, because the Club sought to teach "morals and character development from a particular viewpoint" — a religious viewpoint. *Id.* at 111. Accordingly, that exclusion "constitutes impermissible viewpoint discrimination." *Id.* at 112.

Thus, it is clear from the majority opinion in *Good News Club* that the decision did not rest on the intersection of public forum doctrine and fundamental rights jurisprudence. Rather, the majority reached its decision by applying previously-established First Amendment doc-

trine — viewpoint-neutrality — to a new factual scenario. We have already discussed and rejected the plaintiffs' contention that their exclusion somehow amounts to discrimination against a "homeschooling perspective." Having satisfied ourselves that exclusion of the plaintiffs' proposed use is viewpoint-neutral, we are also satisfied that we are following the dictates of *Good News Club*. We are content to take the Supreme Court at its word that *Good News Club* is a case about viewpoint-discrimination. The plaintiffs' argument finds no support in the Supreme Court's free speech jurisprudence, and we are not inclined to break new ground ourselves. We therefore reject the plaintiffs' argument that otherwise-permissible status distinctions restricting the scope of a limited public forum may not be drawn based on an activity which, incidentally, constitutes the exercise of a fundamental right by the speaker.

### III.

Apart from the plaintiffs' First Amendment claim, they also claim that Calvert County's denial of their application to use the facility for homeschool courses denies them equal protection of the law in violation of the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause is a "'direction that all persons similarly situated should be treated alike.'" *Fisher v. King*, 232 F.3d 391, 399 (4th Cir. 2000) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). Classifications based on race, national origin, alienage, sex, and illegitimacy must survive heightened scrutiny in order to pass constitutional muster. *City of Cleburne*, 473 U.S. at 440-41. All other classifications need only be rationally related to a legitimate state interest. *Id.* at 440.

The plaintiffs claim that Calvert County's policy prohibiting private educational activities intended to meet state educational requirements impermissibly abridges their right to equal protection. The plaintiffs assert that Calvert County's policy infringes on their fundamental right to direct the upbringing of their children. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982); *Pierce*, 268 U.S. at 534-35. The plaintiffs, however, are free to homeschool their children in whichever manner they choose, provided that they comply with Maryland's homeschooling law. Calvert County's policy merely prohibits the plaintiffs, along

with all other private school entities, from using the community centers as private educational centers. Homeschooled and other privately educated children are free to participate in any and all Parks and Recreation programs at the community centers and can even incidentally claim these activities in their portfolios to fulfill state education requirements. The facts of this case simply do not implicate the plaintiffs' freedom to make decisions concerning the care, custody, and control of their children. Accordingly, Calvert County's policy prohibiting private educational activities intended to meet state educational requirements need only be rationally related to a legitimate government interest. *See Heller v. Doe*, 509 U.S. 312, 319-20 (1993); *Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir. 1996).

"[T]he pertinent question for determining whether the governmental action violated the Equal Protection Clause is whether [Calvert County] officials *reasonably could have believed* that the action was rationally related to a legitimate governmental interest." *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 290 (4th Cir. 1998) (emphasis added). The stated government interests at stake are (1) Calvert County's interest in maintaining the recreational character of the community centers; and (2) Calvert County's interest in avoiding duplicative use of its resources. In light of our discussion in part II, we have no trouble concluding that Calvert County's exclusion is rationally related to these legitimate governmental interests and does not violate the plaintiffs' Fourteenth Amendment right to equal protection under the law.

IV.

Because Calvert County has not violated the plaintiffs' right to free speech under the First Amendment or the plaintiffs' right to equal protection under the Fourteenth Amendment, the judgment of the district court is

*AFFIRMED.*

NIEMEYER, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment:

The plaintiffs in this case seek to use the Calvert County Northeast Community Center in Chesapeake Beach, Maryland, as a place for

conducting their homeschooling to meet Maryland State educational requirements. They were denied this request because the place provided by Calvert County for formal elementary and secondary education is at public schools provided by the Calvert County Board of Education, and Calvert County did not intend to let the community center function as a school designed to meet State educational requirements. As the Board of County Commissioners of Calvert County explained to the plaintiffs:

> Community centers are designed and built for the recreational needs of the community at large. We do not want to devote space in the centers for educational activities associated with meeting the State requirements for elementary or secondary education. We are meeting those needs through our funding of the Calvert County Board of Education. We believe that allowing the centers to be used for formal education would amount to duplication of services.

The plaintiffs contend that the county's position violates their right of free speech as protected by the First Amendment. I disagree. The county has not, even by implication, challenged what the plaintiffs can teach or what their students can learn at any location in the county, including at the Calvert County Northeast Community Center. While the substance of matters taught in homeschooling may be protected speech, as noted by Judge Goodwin in Part II.A, *ante*, the county's regulation does not aim in any way at what is taught, what is learned, or even how any subject matter is taught. To conclude that the county's regulation of the use of its community center is a regulation of speech would convert every governmental use regulation of public spaces into a First Amendment issue. I agree with the district judge's conclusion that the regulation in this case does not implicate the First Amendment. Accordingly, I respectfully dissent from Parts II.A and II.B of Judge Goodwin's fine opinion.

Because two of my colleagues conclude that the First Amendment is implicated, I consider the issues that follow therefrom and concur in the subsequent First Amendment discussions in Parts II.C, II.D, and II.E of Judge Goodwin's opinion. I also concur in Parts I, III, and IV and in the judgment.