*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0086A (6th Cir.)
File Name: 04a0086a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED FOOD &
COMMERCIAL WORKERS
LOCAL 1099; JUDY BISHOP;
DOUG BURGSTALLER; JEFF
CRIDER; RAY EVANS, III;
BONNIE FRANCE; CHAD
HELMLINGER; LEAH
HELMLINGER; TONYA
MCCOY; BRYON O'NEAL;
JEFF OSTING; KEITH
ROBINSON; JESSICA
SAGRAVES,

     *Plaintiffs-Appellants,*

     *v.*

CITY OF SIDNEY; MICHAEL
PUCKETT; STEVEN B.
WEARLY; SIDNEY CITY
SCHOOLS; STEVE MILLER;
KEVIN O'LEARY,

     *Defendants-Appellees,*

WAL-MART STORES, INC., et
al.; JOHN WATERS; GREG
FRANKS,

     *Defendants.*

No. 02-3415

———————

2    *United Food & Commercial Workers*    No. 02-3415
*Local 1099, et al. v. City of Sidney, et al.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 00-00296—Walter H Rice, District Judge.

Argued: July 31, 2003

Decided and Filed: March 24, 2004

Before: KENNEDY, GILMAN, and GIBBONS, Circuit
Judges.

———————

## COUNSEL

**ARGUED:** Timothy M. Burke, MANLEY BURKE,
Cincinnati, Ohio, for Appellants. Boyd W. Gentry,
SURDYK, DOWD & TURNER, Dayton, Ohio, Brian L.
Wildermuth, LAW OFFICES OF NICHOLAS E. SUBASHI,
Dayton, Ohio, for Appellees. **ON BRIEF:** Timothy M.
Burke, Rhonda S. Frey, MANLEY BURKE, Cincinnati,
Ohio, for Appellants. Edward J. Dowd, SURDYK, DOWD
& TURNER, Brian L. Wildermuth, Nicholas E. Subashi,
LAW OFFICES OF NICHOLAS E. SUBASHI, Dayton,
Ohio, Michael Fay Boller, ASSISTANT SHELBY COUNTY
PROSECUTOR, Sidney, Ohio, for Appellees.

———————

## AMENDED OPINION

———————

JULIA SMITH GIBBONS, Circuit Judge. Plaintiffs-
appellants, United Food and Commercial Workers Local 1099
("Local 1099") and twelve of its members, brought suit under
42 U.S.C. §§ 1983 and 1985 against defendants-appellees

after they were prohibited from soliciting signatures for a referendum petition outside six polling places on election day in Sidney, Ohio. These polling places included four public schools, the local Y.M.C.A., and a church. At each location, members of Local 1099 attempted to solicit signatures in areas on school or private property that were outside of the areas that had been designated as "campaign-free zones" pursuant to an Ohio statute. Nevertheless, appellants were asked to leave the premises, and in many cases they were threatened with arrest if they failed to comply. At one location, two individual appellants were threatened with arrest even after they had relocated to a spot on a public sidewalk, outside of the campaign-free zone.

Defendants-appellees Sidney City Schools, Superintendent Steve Miller, and Shelby County Sheriff Kevin O'Leary moved to dismiss. The City of Sidney, City Manager Michael Puckett, and Chief of Police Steven Wearly moved for judgment on the pleadings. The district court concluded that the appellants had not suffered a deprivation of their First Amendment rights when they were denied permission to solicit signatures at each of the six polling places and granted the appellees' motions. We agree with the district court that appellants' First Amendment rights were not violated when they were prohibited from soliciting signatures in those areas that were (a) within the campaign-free zone, regardless of whether the campaign-free zone encompassed a traditional public forum such as a sidewalk, or (b) on school or private property, but outside of the campaign-free zone. However, plaintiffs have alleged facts supporting a claim that they were deprived of their First Amendment rights when they were threatened with arrest after they moved to the public sidewalk outside of the campaign-free zone at the Y.M.C.A., and to that extent, their § 1983 claim should be permitted to move forward. We therefore affirm in part, reverse in part, and remand to the district court for further proceedings consistent with this opinion.

## I.

### A. Factual Background

On February 28, 2000, the City Council of Sidney, Ohio, enacted Ordinance No. A-2203, which "effected the rezoning of Lots 5918 and 6180 from an I-2 Heavy Industrial District to a B-2 Community Business District." The process of rezoning the property was undertaken for the purpose of allowing expansion of a Wal-Mart store at that location. On March 2, 2000, appellants submitted a certified copy of Ordinance No. A-2203 and a pre-circulation referendum petition to the City of Sidney. Pursuant to the city's charter, referendum petitions must be filed within two weeks following the passage of the ordinance called into question. Given the short amount of time in which they had to collect signatures after Ordinance No. A-2003 was enacted on February 28, appellants assert that it was "particularly important to gather signatures on March 7, 2000," the day of the primary election in Ohio. On that date, appellants gathered to solicit signatures for the petition from voters outside six polling places in Sidney. These locations included four public elementary schools (Parkwood, Emerson, Whittier, and Lowell), the Sidney-Shelby Y.M.C.A. ("Y.M.C.A."), and Trinity Church of the Brethren ("Trinity"). Appellants Judy Bishop, Ray Evans, and Jessica Sagraves were at Parkwood; Bryon O'Neal was at Emerson; Keith Robinson and Tonya McCoy were at Whittier; Chad and Leah Helmlinger were at Lowell; Jeff Crider and Jeff Osting were at the Y.M.C.A.; and Doug Burgstaller and Bonnie France were at Trinity.

A set of United States flags was placed outside the entrance of each polling place pursuant to Ohio Rev. Code §§ 3501.30 and 3501.35, which together provide for the creation of a 100-foot campaign-free zone around the entrances to polling places in Ohio. Section 3501.30 instructs each county board of elections to place small United States flags 100 feet from

the polling place on the walkways leading to the entrance in order "to mark the distance within which persons other than election officials, witnesses, challengers, police officers, and electors . . . shall not loiter, congregate, or engage in any kind of election campaigning." Section 3501.35 further states that in the area between the polling entrance and the two flags, no person "shall loiter or congregate," "hinder or delay an elector," or "solicit or in any manner attempt to influence any elector in casting his vote."

Appellants have alleged that at each of the polling places, they were positioned outside or beyond the area marked by the flags. They further allege that they solicited signatures at each location in "a peaceful and non-disruptive manner," and that they "neither interfered with school operations nor hindered public access [to any of the polling places at issue.]"

The locations at which appellants were attempting to solicit signatures and the manner in which they were denied access varied at each polling place. At Parkwood, appellants Bishop, Evans, and Sagraves positioned themselves on school property, but beyond the flag that had been placed outside the entrance to the polling place. They solicited signatures at this location for a short period of time, until the school principal informed them that they would have to relocate to a position beyond a second flag that had been placed "on the side of the school parking lot opposite the polling place." According to appellants, this flag was "far in excess of one hundred feet" from the entrance to the polling place. Shortly after they had relocated to this new position, a deputy from the Shelby County Sheriff's Office ordered them to leave the premises and threatened them with arrest for trespassing if they failed to comply. Appellants then relocated to a public sidewalk, but because most of the voters were parking in the school's parking lot, they allege that they were unable to solicit signatures effectively from that location.

At Emerson, O'Neal and Tambra Young had been soliciting signatures for approximately ninety minutes before the school principal ordered them to leave the property and threatened to call the police if they did not comply. Appellants allege that at some time during the morning of March 7, Ralph Bauer, a member of the Sidney Board of Elections, called the Sidney Police Department and requested that they send cruisers to Emerson, Lowell, the Y.M.C.A., and Trinity. Bauer purportedly informed police that the appellants were soliciting signatures at each of these locations in areas that were within 100 feet of the polling places. An officer from the Sidney Police Department arrived at Emerson and told O'Neal and Young that his supervisor was on the way and that he would decide whether they could remain on the property. Shortly thereafter, Sidney Police Captain Kimpel arrived and told the appellants that if they refused to leave school property they would be trespassing. When O'Neal asked Kimpel how they could be trespassing on public property, Kimpel replied, "I'm not going to argue about this. This is your last warning." According to appellants, "[r]ather than risk receiving a citation or being placed under arrest," they complied with Kimpel's demand and left the property.

At Whittier, appellants Robinson and McCoy positioned themselves outside the side entrance to the polling place. Although flags had been placed 100 feet from the front entrance to the polling site, there were no flags outside the side entrance. Robinson and McCoy collected signatures for two hours, until they were approached and ordered to leave by the assistant superintendent and a polling judge. The assistant superintendent told them that they would have to leave school property because of "safety issues" and that she had already called the police. At this point, Robinson and McCoy left school property and moved to a public sidewalk. Because most of the voters were parking in the school's parking lot, appellants allege that they were unable to solicit signatures effectively from that location.

When the Helmlingers arrived at Lowell, they asked polling officials to identify the locations where they would be permitted to gather signatures. The officials replied that they did not know and called the Board of Elections. According to appellants, one of the officials grabbed the petition out of Leah Helmlinger's hands and said, "Let me take a look at that. So you're against the Wal-Mart?" After one official told them that they could solicit signatures at any point beyond the flags, the Helmlingers positioned themselves "on the public sidewalk, beyond the two flags." Appellants allege that shortly after Bauer's phone call to the Sidney Police Department, an officer arrived at Lowell and told the Helmlingers that school officials had called to complain. The officer told the Helmlingers that the flags had not been placed far enough from the entrance to the polling place at Lowell and that they would have to stay more than 100 feet from that entrance. "Rather than risk receiving a citation or being [placed under arrest]," the Helmlingers complied with the officer's request and left the property.

Crider and Osting collected signatures at the Y.M.C.A. for approximately one hour before an officer with the Sidney Police Department arrived, allegedly after a phone call from Bauer, and used a measuring wheel to mark a line 100 feet from the polling place. The officer informed Crider and Osting that they could solicit signatures anywhere beyond that line. After Crider and Osting had been soliciting signatures for about an hour from this new location, a deputy with the Shelby County Sheriff's Department arrived, and, at the request of Y.M.C.A. membership director Michael Lieber, ordered the appellants to leave Y.M.C.A. property. The officer threatened them with arrest if they failed to comply. Crider and Osting again moved to a different location, this time to a public sidewalk that was more than 100 feet from the polling place. The sheriff's deputy followed and informed them that if they attempted to solicit signatures by calling to anyone in the Y.M.C.A.'s parking lot, he would cite them for disorderly conduct. Because most of the voters were parking

in the Y.M.C.A.'s lot, and the deputy had threatened them with arrest if they either entered the parking lot or attempted to contact voters in the parking lot, appellants allege that they were unable to solicit signatures effectively from this location.

At Trinity, Burgstaller and France collected signatures for one hour before an officer with the Sidney Police Department arrived, again allegedly shortly after a phone call from Bauer. While the officer was speaking with Burgstaller and France, a polling judge came out of the church and told them that they would be permitted to collect signatures as long as they remained beyond a set of flags that had been placed 100 feet from the polling entrance. The officer disagreed, and told the appellants that it was irrelevant whether they were outside of the 100-foot boundary because the church was private property, and the church wanted them to leave. Rather than "risk arrest for trespassing," Burgstaller and France complied with the officer's demand and left church property.

Appellants allege that in response to their petition efforts, the Mayor of Sidney instructed Puckett to draft a counter-petition to facilitate the removal of signatures from their referendum petition. On March 23, 2000, Puckett presented the Board of Elections with the counter-petition and a list of nineteen individuals who purportedly had asked the city to have their names removed from the referendum petition. Appellants alleged that the counter-petition failed to comply with Ohio law, and the Board of Elections referred the issue to the Ohio Secretary of State. On April 17, 2000, the Board of Elections informed the City of Sidney that the counter-petition was invalid, and that there were enough valid signatures on the referendum petition to place the referendum on the November 2000 ballot.

The referendum never took place. On April 3, 2000, the Sidney City Council held a special meeting and adopted Ordinance No. A-2207, which repealed Ordinance No. A-

2203, rendering appellants' referendum petition on that ordinance moot. Shortly after Ordinance No. A-2207 was enacted, the City Council adopted Ordinance No. A-2208, which effected the same rezoning of lots 5918 and 6180 as Ordinance No. A-2203. Both Ordinance Nos. A-2207 and A-2208 contained emergency clauses that caused them to go into effect immediately.

## B.  Procedural History

On June 13, 2000, appellants filed a complaint in the United States District Court for the Southern District of Ohio asserting claims under 42 U.S.C. §§ 1983 and 1985. In their § 1983 claim, appellants alleged that the appellees deprived them of their federal constitutional rights under the First and Fourteenth Amendments by preventing them from soliciting signatures outside the areas demarcated by flags at public polling places on March 7, 2000.[1] In their § 1985 claim, appellants alleged that the City of Sidney, Puckett, Wal-Mart, Wal-Mart district manager John Waters, and Sidney Wal-Mart store manager Greg Franks conspired "to prevent [them] from engaging in their statutorily-protected right to obtain signatures for the referendum petition, to introduce an improper and misleading 'counter-petition' in an attempt to influence the Board of Elections' decision-making process, and to circumvent [their] right to a referendum through a pattern of unlawful, corrupt, and unethical legislative conduct."[2]

The Sidney City Schools and Miller moved to dismiss. O'Leary filed a separate motion to dismiss the claims against

---

[1] Appellants voluntarily dismissed their claims against Miller, Puckett, Wearly, and O'Leary in their respective individual capacities.

[2] Appellants have voluntarily dismissed their claims against Wal-Mart, Waters, and Franks.

him in his official capacity, and the City of Sidney, Puckett, and Wearly filed a motion for judgment on the pleadings. The district court granted these motions on March 11, 2002. The court concluded that the presence of polling sites on the properties at issue did not transform the areas surrounding those polling sites into traditional public forums. The court also found that Ohio Rev. Code § 3501.29, which provides that public and private buildings may be utilized "for the purpose of holding elections," created a designated public forum "for the limited purpose of voting, [but] not for other expressive activities which may accompany elections." In its decision granting the motions to dismiss, the court afforded appellants an opportunity to file an amended complaint in order to set forth allegations to support their contention that the Sidney City Schools had, by policy or practice, designated school property as a public forum for the purpose of campaigning and other expressive activities on days when the schools were being used as polling places. The appellants did not avail themselves of this opportunity. Since the court concluded that appellants had not alleged sufficient facts to support a claim that they were deprived of their First Amendment rights, the court also found that they had failed to plead that the City of Sidney and Puckett had conspired to deprive them of those rights, and dismissed their claims under § 1985 as well. On April 9, 2002, appellants filed this timely appeal.

## II.

This court reviews a district court's decision to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) *de novo*. *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998). Rule 12(b)(6) provides that a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal pursuant to a Rule 12(b)(6) motion is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* (citing *Hishon v. King & Spalding*, 467 U.S.

69, 73 (1984)). Although we must accept as true all of the factual allegations in the complaint, we need not accept as true legal conclusions or unwarranted factual inferences. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987) (citations omitted).

The standard of review applicable to a motion for judgment on the pleadings under Rule 12(c) is the same *de novo* standard that is applicable to a motion to dismiss under Rule 12(b)(6). *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001). In reviewing such motions, we must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. *Id.*

### A.    Appellants' § 1983 Claims

In order to state a cause of action under § 1983, appellants must allege (1) that they were deprived of a right secured by the Constitution or the laws of the United States, and (2) that the deprivation was caused by a person acting under color of state law. *Moore v. City of Paducah*, 890 F.2d 831, 833-34 (6th Cir. 1989). To evaluate appellants' § 1983 claims in this case, we must consider whether their First Amendment rights were violated when they were not permitted to solicit signatures for their referendum petition in the areas surrounding the six polling places at issue.

Assuming that the solicitation of signatures for a referendum petition is a protected form of speech under the First Amendment, the mere fact that a certain category of speech is worthy of constitutional protection does not mean that it is "equally permissible in all places and at all times." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). The government is not required to grant access to all who wish to exercise their right to free speech on

every type of government property "without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id.* at 799-800. Rather, the existence of a right of access to government property and the extent to which such access may be limited by the government depend on the character of the property at issue. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).

The Supreme Court has adopted a forum analysis "as a means of determining when the government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius*, 473 U.S. at 800. The Court has identified three types of forums: the traditional public forum, the designated public forum, and the nonpublic forum. *Id.* at 802. Traditional public forums are those places "which by long tradition or by government fiat have been devoted to assembly and debate." *Perry*, 460 U.S. at 45. Government may also create a public forum by its designation of "a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802. In traditional and designated public forums, content-based restrictions on speech are prohibited unless necessary to serve compelling state interests and narrowly tailored to achieve those interests. *Id.* By contrast, restrictions on speech in nonpublic forums are permissible so long as they are viewpoint neutral and reasonable in light of the purpose served by the forum. *Id.* at 49.

To determine the extent to which the government may limit access to its property, then, we must first identify the relevant forum to which the appellants sought access, and next consider whether the relevant forum is public or nonpublic, because the government's ability to place restrictions on speech varies with the type of forum involved. *Cornelius*, 473 U.S. at 797. In this case, appellants were soliciting

signatures for their referendum petition at various positions around polling places located on both public and private property, but our inquiry into the relevant forum does not end merely by identifying these two broad categories: "Rather, in defining the relevant forum we have focused on the access sought by the speaker. When speakers seek general access to public property, the forum encompasses that property." *Id.* When speakers seek more limited access, however, we must take "a more tailored approach to ascertaining the perimeters of [the relevant] forum within the confines" of the government property at issue. *Id.* Appellants here were not seeking general access to the school and private properties involved, but were instead seeking more limited access to the areas surrounding each of the six polling places. These locations can be grouped into three categories: (1) the public sidewalk within 100 feet of the polling place, (2) the parking lots and walkways on school or private property leading to the polling place, and (3) the public sidewalk beyond 100 feet from the polling place. Having identified these three relevant forums, we must next consider whether each forum is public or nonpublic, and whether the government's justification for prohibiting appellants from soliciting signatures in each area met the requisite constitutional standard.

## 1. The Public Sidewalk Within 100 Feet of a Polling Place

Appellants allege that at Lowell, the Helmlingers tried to solicit signatures from a position "on the public sidewalk." They argue that appellees' conduct prohibiting them from soliciting signatures at this location constituted an impermissible restriction on their speech in a traditional public forum. Traditional public forums are those places which "by long tradition or by government fiat have been devoted to assembly and debate." *Perry*, 460 at 45. While it is true that public sidewalks are generally considered traditional public forums, *see Frisby v. Schultz*, 487 U.S. 474, 480-81 (1988), speakers may nevertheless be excluded from

a traditional public forum on the basis of the content of their speech as long as the exclusion is necessary to serve a compelling state interest and narrowly tailored to achieve that interest. *Perry*, 460 U.S. at 45.

Appellants' complaint in this case makes clear that the Helmlingers were deterred from soliciting signatures on the public sidewalk in front of Lowell because the sidewalk was within the 100-foot campaign-free zone established by Ohio Rev. Code §§ 3501.30 and 3501.35. The Supreme Court upheld the constitutionality of a similar "campaign-free zone" in *Burson v. Freeman*, 504 U.S. 191, 196-97, & n.2 (1992), even though the statute in question barred speech in areas that included "quintessential public forums," such as the streets and sidewalks adjacent to polling places. The Court concluded that the "campaign-free zone" was necessary in order to serve the state's compelling interest in protecting voters from confusion and undue influence, and that the statute was narrowly drawn to achieve that interest. *Id.* at 199 (noting that the Court has upheld "generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself"). In light of a long history of problems with voter intimidation and election fraud in this country, the Court held that Tennessee could decide that the "last 15 seconds before its citizens enter the polling place should be their own, as free from interference as possible." *Id.* at 210. The Court did not limit its opinion only to those cases where voter confusion and undue influence had already been shown: "A long history, a substantial consensus, and simple common sense show that some restricted zone around polling places is necessary to protect [the fundamental right to vote]," even when that right conflicts with the exercise of free speech. *Id.* at 211.

Thus, a state may require persons soliciting signatures to stand 100 feet from the entrances to polling places without running afoul of the Constitution. *Id.* at 211. The Helmlingers therefore were not deprived of their First

Amendment rights when they were ordered to move from the public sidewalk to a position beyond 100 feet from the polling place. In keeping with *Burson*, Ohio may prevent persons from soliciting signatures within 100 feet of polling places, even in areas that include traditional public forums such as sidewalks.

### 2. The Parking Lots and Walkways Leading to the Polling Place

At Parkwood, Emerson, Whittier, Trinity, and the Y.M.C.A., appellants set up to gather signatures at various locations on school and private property that were outside the campaign-free zone established by §§ 3501.30 and 3501.35. Appellants argue that the presence of the polling places affected the character of the school and private property that surrounded them. They contend that Ohio created a designated public forum by providing for the use of school and private buildings "for the purpose of holding elections" in Ohio Rev. Code § 3501.29. The district court concluded that by enacting § 3501.29, the Ohio legislature indicated an intent to open up a portion of public school and private property to registered voters for the limited purpose of voting, but not for other expressive activities which may accompany elections. This "limited designated public forum" included the parking lot, the walkways and hallways leading to the polls, and the area containing the voting booths themselves; all other areas on school and private property remained nonpublic forums.

In reaching this conclusion, the district court relied heavily on the Eighth Circuit's decision in *Embry v. Lewis*, 215 F.3d 884 (8th Cir. 2000). In *Embry*, the plaintiffs attempted to gather signatures for a referendum petition outside a school building that had been designated as a polling place. *Id.* at 886. They set up a table "on the grass of the school's west property," near, but not upon the public sidewalk. *Id.* One of the plaintiffs refused to leave the property when asked by the

school's principal, and she was arrested. *Id.* at 886-87. In a subsequent action brought under § 1983, the plaintiffs argued that Missouri had designated the school property, and in particular the limited area in which they were located, "as a limited public forum for the purpose of voting and electioneering activities on that particular day." *Id.* at 887. The Eighth Circuit held that

> [o]nly a portion of the school property was a designated public forum . . . for the limited purpose of voting . . . . Specifically, this area included the parking lot, the walkway leading to the west entrance, the hallway inside the school leading to the voting booths, and the area containing the voting booths. All other areas of school property, however, remained a nonpublic forum.

*Id.* at 888. The plaintiffs in *Embry* were not located on those portions of school property that had been appropriated for election purposes; they were on the grassy area located next to the sidewalk. *Id.* at 888-89. The court concluded that this area remained a nonpublic forum on election day, and that the decision to exclude the plaintiffs from this portion of school property was a reasonable and viewpoint neutral restriction on speech in a nonpublic forum. *Id.* at 889.

Appellants note that, unlike the plaintiffs in *Embry*, they attempted to solicit signatures from the parking lots and walkways leading to the polling places – precisely those areas that the Eighth Circuit concluded had been designated as public forums for the limited purpose of voting on election day. They argue that if these areas were in fact designated as public forums, the state could not open them up for the limited purpose of voting and at the same time restrict similar types of expressive activities that were consistent with the principal function of the forum. Thus, we must decide whether the parking lot and walkways leading to polling places are "designated public forums for the limited purpose of voting," and whether the action of appellees in restricting

the appellants' ability to solicit signatures in these areas was permissible.

As we have already noted, the government creates a designated public forum where it opens up its property for use by the public as a place for expressive activity. *Perry*, 460 U.S. at 45. The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening up a nontraditional forum for public discourse. *Cornelius*, 473 U.S. at 802. In determining whether the government has intended to open up its property for use as a designated public forum, the Supreme Court has said that we must look to the policy and practice of the government, as well as to the nature of the property and its compatibility with expressive activity. *Id.*

There is no evidence in the record in this case that indicates that Ohio intended to open up nontraditional forums such as schools and privately-owned buildings for public discourse merely by utilizing portions of them as polling places on election day. Appellants were given the opportunity by the district court to amend their complaint in order to set forth allegations supporting their contention that the government had, by policy or practice, designated the property surrounding the polling places as a public forum for the purposes of campaigning or other expressive activities. They did not avail themselves of this opportunity. Appellants also argue that § 3501.30's designation of a campaign-free zone outside every polling place is evidence of the compatibility of expressive activity with polling places because it "implies an expectation that people will gather at polling places to express themselves." The district court rejected this argument, and so do we. Just because certain types of speech are expressly prohibited within a certain area does not mean that they are therefore permissible outside that area. *See Embry*, 215 F.3d at 888-89 ("Although Missouri law makes it an offense to electioneer within 25 feet of a polling place's outer door, it

does not automatically follow that electioneering is allowed anywhere outside the 25 foot line.").

Although the issue was not squarely before the court in *Embry* because the plaintiffs in that case were on the grassy area located next to the sidewalk, the Eighth Circuit described the parking lot and walkways leading to the polling places as "designated public forums for the limited purpose of voting." We respectfully disagree. The forum at issue here is neither a traditional public forum nor a government-designated one. By opening up portions of school and private property for use as polling places on election day, Ohio has not opened up a nontraditional forum for public discourse. In fact, there is no evidence in the record of discourse of any sort. There is no evidence of expressive activity occurring anywhere on the properties involved, other than "each voter's communication of his own elective choice[,] and this has long been carried out privately – by secret ballot in a restricted space." *See Marlin v. District of Columbia Bd. of Elections & Ethics*, 236 F.3d 716, 719 (D.C. Cir. 2001) (holding that the interiors of polling places are nonpublic forums).

When the district court, following the decision in *Embry*, described the parking lots and walkways leading to the polling places as "limited designated public forums," it may have had in mind the "limited public forum" described in *Good News Club v. Milford*, 533 U.S. 98, 106 (2001). In *Good News,* the Supreme Court employed the term "limited public forum" to refer to a forum that the state had reserved "for certain groups or for the discussion of certain topics." *Id.* In such forums, government restrictions on speech must be reasonable and viewpoint neutral, the same standards that apply to restrictions on speech in nonpublic forums. *Id.* Our circuit and others have noted the confusion surrounding the use of the terms "designated public forum" and "limited public forum." *See, e.g.*, *Goulart v. Meadows*, 345 F.3d 239, 249 (4th Cir. 2003); *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 567 (7th Cir. 2001) ("[T]he use of this terminology . . .

has introduced some analytical ambiguity because the [Supreme] Court previously had employed the term "limited public forum" as a subcategory of the designated public forum, subject to the strict scrutiny governing restrictions on designated public forums"); *Putnam Pit v. City of Cookeville*, 221 F.3d 834, 842 n.5 (6th Cir. 2000).[3] We do not need to delve deeply into the nuances of designated versus limited public forums in this case, however, because these types of forums are characterized by discourse, and discourse is what is absent here. That some expressive activity occurred within the context of the forum created "does not imply that the forum thereby [became] a public forum for First Amendment purposes." *Cornelius*, 473 U.S. at 805. In the absence of evidence of an intent on the part of the government to open these nontraditional forums for public discourse, limited or otherwise, we conclude that the parking lots and walkways leading to the polling places are nonpublic forums, with no different status than the remaining areas on school and private property.

Having concluded that the parking lots and walkways leading to the polling places are nonpublic forums, we must next consider whether the restriction on soliciting signatures was reasonable and viewpoint neutral. The reasonableness of the government's restriction on access to a nonpublic forum

---

[3]The Fourth Circuit treats the terms "designated public forum" and "limited public forum," as two names for the same type of forum. *Goulart*, 345 F.3d at 250. Some circuits consider the limited public forum to be a subcategory of the designated public forum. *Donovan v. Punxsutawney Area Sch. Dist.*, 336 F.3d 211, 225 (3d Cir. 2003); *Hopper v. City of Pasco*, 241 F.3d 1067, 1075-76 (9th Cir. 2001). Still others consider the limited public forum to be a subset of the nonpublic forum classification. *Summum v. City of Ogden*, 297 F.3d 995, 1002 n.4 (10th Cir. 2002). We need not resolve this issue here because we conclude that the parking lots and sidewalks leading to the polling places are nonpublic forums, but we note that the result in this case would be the same if we had concluded that these areas were instead limited public forums.

must be assessed in light of the purpose of the forum and all of the surrounding circumstances. *Cornelius*, 473 U.S. at 810. According to appellants' complaint, school officials asked them to leave the premises because they were concerned about "safety issues." At the Y.M.C.A. and Trinity, police officers were responding to requests from the owners of those properties when they asked appellants to leave the premises. Appellants argue that their exclusion from these properties was unreasonable because they were soliciting signatures in a peaceful and non-disruptive manner. However, the government does not need to wait "until havoc is wreaked to restrict access to a nonpublic forum." *Cornelius*, 473 U.S. at 810. Furthermore, appellees could prohibit appellants from soliciting signatures if they thought that their activities would disrupt the polling place or the school or private property surrounding it. "Although the avoidance of controversy is not a valid ground for restricting speech in a public forum, a nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas. The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic form and hinder its effectiveness for its intended purpose." *Id.* Appellants argue in their brief that their exclusion from the areas outside of the polling places was an attempt to suppress their speech because public officials opposed their views, but they have alleged no facts to support this allegation. There is no contention, for example, that others were permitted to solicit signatures for referendum petitions on other topics, or that anyone was allowed to engage in other types of electioneering activities within these areas. Under these circumstances, we conclude that the decision to exclude appellants from soliciting signatures in the parking lots and walkways leading to the polling places was reasonable and viewpoint neutral, and that the appellants' First Amendment rights were not violated when they were denied access to these nonpublic forums.

### 3. The Public Sidewalk Beyond 100 Feet From the Polling Place

In a footnote in its opinion dismissing the claims against the Sidney City Schools and Miller, the district court stated that "[t]here is no allegation that the [appellants] were denied the ability to solicit signatures from adjacent, public property such as the sidewalks in front of the polling place." *United Food & Commercial Workers, Union Local 1099 v. City of Sidney*, 199 F. Supp. 2d 739, 742 n.6 (S.D. Ohio 2002). This conclusion is contrary to allegations in the complaint that appellants were prohibited from soliciting signatures from the public sidewalk within the campaign-free zone at Lowell, and from the public sidewalk outside the campaign-free zone at the Y.M.C.A. We have already determined that appellants were not deprived of their First Amendment rights at Lowell because, although they were on the public sidewalk, they were also within the 100-foot campaign-free zone established by §§ 3501.30 and 3501.35. Now we must decide whether appellants were deprived of their First Amendment rights when a deputy with the Shelby County Sheriff's Office threatened two of the appellants with arrest if they attempted to solicit signatures by calling out to anyone in the Y.M.C.A. parking lot, even after they had relocated to a public sidewalk beyond 100 feet from the polling place.

"[S]peech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum." *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 377 (1997). As we have already noted, in a traditional public forum, content-based restrictions on speech must be necessary to serve compelling state interests and narrowly tailored to achieve those interests. *Perry*, 460 U.S. at 45. The state may also enforce regulations of the time, place, and manner of expression, provided the regulations (1) are content-neutral, (2) are narrowly-tailored to serve a significant government interest, and (3) leave open ample alternative channels of communication. *Id.* Thus, the

appropriate level of scrutiny is initially tied to whether the restriction distinguished between prohibited and permitted speech on the basis of content. *See Frisby*, 487 U.S. at 481. Content-neutral regulations are those that are "justified without reference to the content of the speech." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Counsel, Inc.*, 425 U.S. 748, 771 (1976). Content-based restrictions, on the other hand, regulate speech on the basis of the ideas expressed. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). It is impossible to determine from this record whether the deputy's threat of arrest was based on the content of the appellants' speech or on content-neutral time, place, and manner concerns. At this stage of the litigation, it suffices to say that appellants have alleged facts supporting a claim that their First Amendment rights were violated when they were threatened with arrest even after they had moved to the public sidewalk. It was not necessary for them to first expose themselves to arrest or prosecution in order to be able to seek relief. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974). We leave it to the district court on remand to determine if the appellants' First Amendment rights were in fact deterred or chilled by the deputy's threat of arrest, and whether that threat was motivated by reasonable time, place, and manner concerns or whether it was an impermissible content-based restriction on speech in a traditional public forum. *See Pouillon v. City of Owosso*, 206 F.3d 711, 717-18 (6th Cir. 2000).

Because appellants have not alleged facts supporting their claims that their First Amendment rights were violated when they were denied the opportunity to solicit signatures at the four public schools involved in this case, we affirm the district court's decision dismissing their § 1983 claims against the Sidney City Schools and Superintendent Miller. Appellants also have failed to allege facts supporting their claim that their First Amendment rights were violated by the City of Sidney or its employees Puckett and Wearly, and we

affirm the district court's decision dismissing those claims as well.

Appellants' remaining § 1983 claim is against O'Leary in his official capacity as Shelby County Sheriff, and, as the district court noted, this claim is really one against Shelby County itself. *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 67 (1989); *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 690 n. 55 (1978) (noting that official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent"); *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245-46 (6th Cir. 1989).[4] In order to hold a county government liable under § 1983, appellants must be able to show that they were deprived of a constitutional right and that the county itself was responsible for the violation. *Doe v. Claiborne County*, 103 F.3d 495, 505-06 (6th Cir. 1996). We have already determined that appellants have succeeded, to this point, in alleging that they were deprived of their constitutional rights when a deputy with the Shelby County Sheriff's Office threatened them with arrest even after they moved to the public sidewalk at the Y.M.C.A. Appellants have also alleged that this constitutional violation occurred "in furtherance of . . . official policy." We note that in order to be successful on remand, appellants must prove not only that their expression was in fact deterred or chilled by the deputy's conduct, but also that the deputy threatened to call the police because of the content of their message and not merely because he had valid content-neutral time, place, and manner concerns. Additionally, in order to hold the county liable under § 1983, appellants must be able to prove that the deputy

---

[4]Although Sheriff O'Leary has raised the defense of qualified immunity, this defense is not available to officers who have been sued in their official capacities. *Alkire v. Irving*, 330 F.3d 802, 810-11 (6th Cir. 2003).

acted pursuant to an official policy or custom. *See Monell*, 436 U.S. at 691.

**B.    Appellants' § 1985 Claim**

In addition to their § 1983 claims, appellants also alleged in their complaint that the City of Sidney, Puckett, Wal-Mart, and two of Wal-Mart's employees conspired to prevent them from "engaging in their statutorily-protected right to obtain signatures for a referendum petition, to introduce an improper and misleading 'counter-petition' in an attempt to influence the Board of Elections' decision-making process, and to circumvent their right to a referendum through a pattern of unlawful, corrupt, and unethical legislative conduct," in violation of § 1985. Because the appellants have dismissed their claims against the three Wal-Mart defendants, the only remaining defendants in their § 1985 claim are the City of Sidney and City Manager Puckett.

To state a cause of action under § 1985, appellants must prove the existence of a conspiracy among two or more persons. *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991). In this case, appellants are alleging a conspiracy between the city and one of its officers acting in his official capacity. This court has rejected the concept of an "intra-corporate conspiracy" and has held that an entity cannot conspire with its own agents or employees. *See id.* Since the remaining § 1985 defendants are the City and one of its employees, appellants cannot meet their burden of proving a conspiracy between two or more persons. We therefore affirm the district court's decision dismissing their claims under § 1985.

### III.

For the foregoing reasons, we affirm the district court's decision dismissing appellants' § 1983 claims against the Sidney City Schools, the City of Sidney, Miller, Puckett, and Wearly.  We also affirm the district court's decision dismissing appellants' § 1985 claims against the City of Sidney and Puckett.  We reverse the district court's decision dismissing appellants' § 1983 claims against Sheriff O'Leary in his official capacity insofar as it relates to activities on the public sidewalk outside the campaign-free zone at the Y.M.C.A. and remand to the district court for further proceedings consistent with this opinion.